IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| CHARLES K. EDMUNDS, | CV 20-17-BLG-TJC |
| Plaintiff, | |
| vs. | **ORDER** |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Charles K. Edmunds ("Edmunds") filed a complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") regarding the denial of claims for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433.  (Doc. 2.)  The Commissioner subsequently filed the Administrative Record ("A.R.").  (Doc. 19.)

Presently before the Court is Edmunds' motion for summary judgment, seeking reversal of the Commissioner's denial of disability benefits and remand for an award of disability benefits, or alternatively for further administrative proceedings.  (Doc. 23.)  The motion is fully briefed and ripe for the Court's review.  (Docs. 23-25.)

1

For the reasons set forth herein, and after careful consideration of the record and the applicable law, the Court hereby finds the case should be **REMANDED** for further administrative proceedings.

## I.    Procedural Background

Edmunds completed his application for DIB on September 21, 2012, alleging disability for depression, panic attacks, anxiety, non-sustained ventricular tachycardia, and knee screws beginning on August 22, 2012.  (A.R. 22, 109, 186.) Edmunds' initial determination was "not disabled," and his claim was denied on June 21, 2013.  (A.R. 109-115.)  Edmunds requested reconsideration on July 16, 2013, and denial was affirmed on October 15, 2013.  (A.R. 22, 117-126.) Edmunds subsequently requested a hearing, which was held October 22, 2014, in Billings, Montana, before an Administrative Law Judge ("ALJ").  (A.R. 22, 38.) The ALJ concluded Edmunds was not disabled on January 22, 2015.  (A.R. 23, 33.)

Edmunds requested review of the ALJ's decision by the Social Security Administration ("SSA") Appeals Council on March 16, 2015.  (A.R. 1-2, 693-95.) The Appeals Council denied Edmunds' request on May 19, 2016.  (A.R. 1, 591, 664.)  Edmunds subsequently appealed the decision to this Court on July 14, 2016. *See Edmunds v. Colvin*, Case No. CV-16-110-TJC (D. Mont. July 14, 2016); (A.R. 598).  The parties stipulated to reversal and remand of the case back to the SSA.

*Edmunds*, CV-16-110 at Doc. 20.  Accordingly, on January 9, 2017, the Court

ordered the SSA to:

> reevaluate Plaintiff's ability to perform his past relevant work, including making specific findings about how Plaintiff actually did his work and comparing those requirements with Plaintiff's residual functional capacity.  If the agency concludes that Plaintiff cannot perform his past relevant work, the agency will reevaluate whether Plaintiff could perform other work existing in significant numbers in the national economy, obtaining supplemental vocational expert evidence.

*Id.* at Doc. 21. (A.R. 616-17.)  The SSA's Appeals Council, in turn, ordered a

rehearing before the ALJ, which was held on August 1, 2017.  (A.R. 506-71, 623.)

Two weeks later, on August 15, 2017, the ALJ determined that Edmunds was not

disabled.  (A.R. 664-79.)

Edmunds filed a written exception to the decision on September 14, 2017,

and the Appeals Council remanded the case back to the ALJ with several directives

for reconsideration on June 17, 2018.  (A.R. 689-91, 759-61.)  A third hearing

before the ALJ was held on February 26, 2019.  (A.R. 460-505.)  The ALJ again

issued an unfavorable decision, finding Edmunds not disabled on April 17, 2019.

(A.R. 431-50.)  Edmunds again filed written exceptions with the Appeals Council

in June 2019.  (A.R. 423.)  The Appeals Council denied reconsideration on

February 3, 2020.  (A.R. 416-22.)  Edmunds filed the instant action in this Court

on February 27, 2020.  (Doc. 2.)

/ / /

## II.      Legal Standards

### A.      Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Court must affirm the Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten*, 44 F.3d at 1457.  In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975).  The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational

interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary."). But even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

**B.     Determination of Disability**

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) he suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work he previously performed, or any other substantial gainful employment which exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A). A claimant must meet both requirements to be classified as disabled. *Id*.

The Commissioner makes the assessment of disability through a five-step sequential evaluation process. If an applicant is found to be "disabled" or "not

disabled" at any step, there is no need to proceed further. *Ukolov v. Barnhart*, 420

F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec.*

*Admin*., 223 F.3d 968, 974 (9th Cir. 2000)).  The five steps are:

1. Is claimant presently working in a substantially gainful activity?  If so,
   then the claimant is not disabled within the meaning of the Social
   Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b),
   416.920(b).

2. Is the claimant's impairment severe?  If so, proceed to step three.  If not,
   then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(c),
   416.920(c).

3. Does the impairment "meet or equal" one of a list of specific
   impairments described in 20 C.F.R. Part 220, Appendix 1?  If so, then the
   claimant is disabled.  If not, proceed to step four.  *See* 20 C.F.R. §§
   404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past?  If
   so, then the claimant is not disabled.  If not, proceed to step five.  *See* 20
   C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work?  If so, then the claimant is not
   disabled.  If not, then the claimant is disabled.  *See* 20 C.F.R. §§
   404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

## III.  Factual Background

### A.    The Hearing

The most recent hearing was held before ALJ Michele M. Kelley on

February 26, 2019, in Billings, Montana.  (A.R. 460-505.)  It was noted at the

outset of the hearing that Edmunds' primary issues are related to his mental health, namely depression/bipolar and anxiety.  (A.R. 472; *see* 406, 1056.)

Edmunds testified that he generally sleeps late each day, perhaps until 1:00 p.m., because he can't get to sleep at night despite taking the sleep medication Temazepam.  (A.R. 473.)  After rising, he primarily stays at home and tries to avoid people.  (*Id.*, 488.)  Edmunds stated that he only sees one old friend every few months and his dad about once a month.  (A.R. 474-75.)  At home, Edmunds primarily helps his wife, Deanna, who is a stroke survivor and visually impaired, covering household duties.  (A.R. 475-76.)  But some days he either cannot or does not do anything.  (A.R. 478, 484.)  On average, Edmunds said he will stay in bed three to four times a week "just to avoid people," stating, "I want to hide."  (A.R. 480.)

Edmunds said his anti-anxiety medication Clonazepam makes him sleepy, and he takes it anywhere from a couple of times a week to four or five times a week.  (A.R. 480.)  Edmunds described other side effects to his medications as including dry mouth/vocal cords, right arm tremor, poor memory, overactive bladder, and constipation.  (A.R. 476-77.)  His tremors only affect his right hand, which causes him to struggle writing legibly or eating while using a fork.  (A.R. 485-86.)

Edmunds also described his physical limitations due to work injuries to his right knee and left sacrum joint and noted his previously reported shoulder pain has improved.  (A.R. 482.)  Edmunds estimated that occasionally lifting 25 pounds was not too much, but he didn't think that he could do it repetitively.  (A.R. 483.)

Edmunds thought his greatest obstacle to working was his concentration, retention of information, and ability to learn.  (A.R. 486, 488-89.)  When he attempted to go back to work for Entre Information Systems, for example, he had an anxiety attack when they were training him to work the help desk.  (A.R. 487.) Since his last hearing, however, his anger issues had improved with medications and counseling.  (*Id.*)  In all, Edmunds felt like he is just not the same efficient, "go-to" type person he used to be.  (A.R. 489.)  For example, he quit his hobbies building computers and playing chess, guitar, and video games.  (A.R. 486, 494.)

The ALJ posed hypotheticals to Karen S. Black, vocational expert ("VE"). (A.R. 496 *et seq.*)  After reviewing Edmunds' work history, the VE concluded that a hypothetical individual with similar characteristics as Edmunds could not perform any of his past work.  (A.R. 496-97.)  The VE opined, however, that a hypothetical individual could perform medium work as a commercial cleaner or laundry worker, or light work as a cleaner/housekeeper or sewing machine operator.  (A.R. 497.)  With the added limitations that the individual could only frequently handle or finger with the right upper extremity, and could only lift,

carry, push or pull 25-50 pounds, the VE opined the individual could not perform the work of a sewing machine operator.  (A.R. 498.)  With those limitations, an individual could only do light work, such as a "clothing presser."  (*Id.*)  With the additional limitation of being off-task 20 percent of an eight-hour day, however, no jobs were available in the national economy.  (A.R. 499.)

Edmunds' attorney examined the VE and added certain variables to the hypotheticals.  (A.R. 500.)  Edmunds' attorney asked whether verbal conflicts, outbursts, or physical demonstrations would affect the ALJ's hypotheticals.  (*Id.*)  The VE responded such behavior would not allow for sustained, full-time employment.  (A.R. 502.)  Edmunds' attorney further inquired whether issues with concentration, learning, and retaining information would affect the hypotheticals, to which the VE replied that the individual would either need accommodated employment or be unemployable.  (A.R. 502.)  Last, Edmunds' attorney asked whether missing work three or four days per month would allow for sustained employment, and the VE stated it would not.  (A.R. 503.)

## B.    Medical Evidence

Edmunds' medical evidence is extensive; the record includes a multitude of providers.  For the purposes of the instant matter, the Court will briefly review the medical records of the providers at issue.

/ / /

### a.    Richard K. Klee, M.D.

Dr. Klee was a family practice physician at Billings Clinic-Columbus

Outpatient Clinic who diagnosed and treated Edmunds for anxiety and depression

before and during the claimed period of disability.  (A.R. 406.)  Dr. Klee's medical

records of Edmunds span more than ten years.  (A.R. 264-303; 313-48; 351-404;

1801-09.)

In January 2011, Dr. Klee reported that Edmunds' depression and anxiety

were "well controlled on Effexor XR 150mg daily."  (A.R. 301.)  But later that

year, in October 2011, Dr. Klee noted Edmunds' apparent mental decline after he

lost his job in June due to conflicts with co-workers, difficulty with controlling his

temper, suicidal ideation that involved brandishing a loaded gun, and a recent

panic attack.  (A.R. 292.)  Dr. Klee increased Edmunds' dosage of Effexor and

Omeprazole.  (*Id.*)  By November 2011, Dr. Klee felt Edmunds had stabilized.

(A.R. 290.)  By February 2013, however, Edmunds' depression had been

worsening "the last three or four months."  (A.R. 270.)  Dr. Klee brought

Edmunds' parents into the exam room to discuss a safety strategy and made "a

safety pact" to call him or the hospital if he has suicidal thoughts.  (*Id.*)  Dr. Klee

also recommended Edmunds present himself to the emergency room for evaluation

"by the PAC team" and possible inpatient treatment.  (A.R. 271.)  Dr. Klee

prescribed Seroquel.  (*Id.*)

On September 22, 2014, Dr. Klee filled out mental health and physical ability questionnaires as Edmunds' treating physician, detailing his medical findings.  (A.R. 405-09.)   Dr. Klee reported that Edmunds had disturbance of mood accompanied by full or partial depressive syndrome, generalized persistent anxiety, and recurrent severe panic attacks, and thus diagnosed him with depression and anxiety with symptoms beginning in 2010 or earlier.  (A.R. 405-06.)  Dr. Klee found Edmunds had "extreme" functional limitations, including restriction of activities of daily living; difficulties in maintaining social functioning; deficiencies of concentration resulting in failure to complete tasks in a timely manner; and episodes of deterioration or decompensation in work or work-like settings.  (A.R. 407.)  Dr. Klee estimated Edmunds' mental impairments or treatment would cause him to be absent from work more than four days per month. (*Id.*)  On November 4, 2014, Dr. Klee completed a Substance Abuse Materiality Questionnaire, indicating that in his opinion Edmunds' substance use was not a material contributing factor to Edmunds' anxiety or depression.  (A.R. 410.)

### b.     Caroline Cassel, FNP, and James B. Whitworth, M.D.

Nurse Practitioner Caroline Cassel completed psychological evaluation forms regarding Edmunds' anxiety and depression on November 5, 2015, which were co-signed by Dr. James B. Whitworth.  (A.R. 1056-58.)  The Anxiety Related Disorder report stated Edmunds exhibited generalized persistent anxiety and

11

experienced recurrent moderate panic attacks. (A.R. 1056.) In rating Edmunds'
functional limitations, N.P. Cassel/Dr. Whitworth found only mild restriction of
activities of daily living, but marked difficulties in maintaining social functioning,
marked deficiencies of concentration, and extreme episodes of deterioration or
decompensation in work or work-like settings, noting, "he has a long [history] of
losing jobs." (*Id.*)

The second questionnaire for depressive disorder found disturbance of mood
accompanied by full or partial depressive syndrome. (A.R. 1057.) N.P. Cassel/Dr.
Whitworth rated Edmunds' restrictions of daily living as moderate; difficulties in
maintaining social functioning as marked; deficiencies of concentration as marked
"(per patient reports)"; and episodes of deterioration or decompensation in work or
work-like settings as extreme "(per patient report)," with a handwritten note that he
"has lost multiple jobs due to mental issues." (*Id.*) The report confirmed
Edmunds' bipolar disorder, and concluded it was "a significant mood disorder."
(*Id.*)

### C.   ALJ Findings

The ALJ followed the five-step sequential evaluation process in considering
Edmunds' claim. At step one, the ALJ found that Edmunds had not engaged in
substantial gainful activity since his alleged onset date of August 22, 2012, through
his last date of insured of December 31, 2016. (A.R. 437.) At step two, the ALJ

found Edmunds had the following severe impairments: impingement of the right shoulder; degenerative arthritis in the right acromioclavicular joint; depressive disorder; anxiety disorder; personality disorder not otherwise specified; and marijuana abuse.  (*Id.*)  At step three, the ALJ found that Edmunds did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (A.R. 438-40.)

Before considering step four, the ALJ determined Edmunds had the residual functional capacity ("RFC") to perform medium work.  (A.R. 440.)  The ALJ found Edmunds could understand simple, detailed, and complex tasks; remember and carry out simple tasks; maintain attention, concentration, persistence, and pace for eight-hour workdays and 40-hour workweeks.  (*Id.*)  The ALJ further found that Edmunds could tolerate occasional interaction with supervisors, coworkers, and the public, but not work in tandem with supervisors or coworkers or work directly with the public.  (*Id.*)

At step four, the ALJ found that Edmunds was unable to perform any past relevant work.  (A.R. 448.)  Finally, at step five, the ALJ found that based on Edmunds' age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that he could perform.  (A.R. 449.)  Accordingly, the ALJ found Edmunds not disabled.  (*Id.*)

/ / /

## IV.  Discussion

Edmunds presents the following issues for review: (1) whether the ALJ

failed to consider the frequency and duration of treatment; (2) whether the ALJ

improperly discounted the findings and opinions of the treating physicians; (3)

whether he met a Listing in Appendix 1; (4) whether the ALJ properly discounted

Edmunds' subjective symptom testimony; and (5) whether Edmunds' impairments

were properly incorporated into the VE's hypothetical.  (Doc. 23 at 5.)  The Court

will address each in turn.

### A.   Consideration of Treatment

Edmunds argues the ALJ improperly ignored Social Security Ruling

("SSR") 96-8p, which requires consideration of the effects of the claimant's

medical treatment on the RFC by incorporating the frequency and duration of

treatment, and SSR 16-3p, which also requires consideration of treatment for pain

and other symptoms.  (Doc. 23 at 25.)  Edmunds argues that by doing so the ALJ

failed to give proper weight to the findings and opinions of Dr. Klee and N.P.

Cassel/Dr. Whitworth, and improperly discounted their testimony.  (*Id.*)  The

Commissioner does not explicitly address Edmunds' arguments based on SSRs 96-

8p or 16-3p, but notes the ALJ considered evidence from the entire period at issue,

and maintains substantial evidence on the record supports the ALJ's findings.  (*Id.*

at 6-7.)

14

SSRs 96-8p and 16-3p require the ALJ to consider the effects of medical treatment in developing the RFC.  SSR 96-8p, 61 Fed. Reg. 34474-01, 1996 WL 362207; SSR 16-3p, 2017 WL 5180304.  SSR 96-8p requires the RFC assessment to be based on all relevant evidence, such as "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)."  SSR 96-8p, 61 Fed. Reg. at 34477.  SSR 16-3p relates more specifically to symptom evaluation and requires that treatments received for pain or other symptoms be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.  SSR 16-3p, 2017 WL 5180304, at *8.

An ALJ's failure to consider the effect of a claimant's treatment needs constitutes reversible error.  *See e.g. Tyler v. Saul*, 2021 WL 2562492, *6 (D. Mont. June 23, 2021) (finding ALJ erred by failing "to note, weigh, or otherwise consider the frequency of treatment entirely in their decision"); *Mariah v. Saul*, 2021 WL 1660947, *8 (D. Mont. April 28, 2021) (remanding action where the ALJ failed to consider the plaintiff's treatment needs in assessing the RFC); *Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980) (finding the ALJ's decision was not supported by substantial evidence because the effect of the claimant's treatment regimen for back injury was ignored).

Here, Edmunds notes that from June 2015 through August 2016, he averaged 4.4 mental health visits per month, or approximately 62 visits in a 14-month period.  (*See* A.R. 1097-1256; 1456-1581.)  In addition, Dr. Klee opined that Edmunds would be absent from work more than four days per month as a result of his impairments and/or his treatment.  (A.R. 407.)

The ALJ discussed Edmunds' mental impairments and daily activities (A.R. 441-45), but did not consider how his treatment needs would potentially interfere with his ability to work.  The Court finds the ALJ's oversight is prejudicial in light of the vocational expert's testimony.  The vocation expert testified that if an individual were to miss three or four days of work per month, that individual would not be able to sustain full-time work.  (A.R. 503.)  The vocational expert also testified that if a person were off-task 20% of a regular eight-hour workday or 40-hour workweek, including normal breaks, the person would not be able to perform full-time work.  (A.R. 499.)  As demonstrated by Edmunds' treatment history, the amount of time needed for his mental health appointments has the potential to exceed those thresholds.  Accordingly, the ALJ erred in failing to consider or discuss Edmunds' treatment needs.  *Kim v. Saul*, 2020 WL 872308, *9-11 (D. Minn. Jan. 28, 2020) (holding that where the objective evidence showed the plaintiff had medical appointments on more than 50 days in a 33-month period,

"the ALJ must explain how this course of treatment is reconcilable with the vocational expert's testimony regarding tolerated absences.").

## B. ALJ's Evaluations of Medical Providers' Opinions

Edmunds argues the ALJ failed to give proper weight to the assessments of his treating providers, Dr. Klee and N.P. Cassel/Dr. Whitworth.  (Doc. 23 at 22.) The Commissioner counters that the ALJ properly considered the medical source evidence.  (Doc. 24 at 11.)

In assessing a disability claim, an ALJ may rely on "opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The Commissioner applies a hierarchy of deference to these three types of opinions.  The opinion of a treating doctor is generally entitled to the greatest weight.  *Id*.  "The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician." *Id.*

"The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'"  *Morgan v. Comm'r of the Soc. Sec. Admin*., 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

"However, the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Id*. *See also Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) ("Although a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability.").

If the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques, or is inconsistent with other substantial evidence in the record, it is not entitled to controlling weight. *Orn v. Astrue*, 495 F.3d 625, 631-32 (9th Cir. 2007) (quoting Social Security Ruling 96-2p). In that event, the ALJ must consider the factors listed in 20 C.F.R. § 404.1527(c) to determine what weight to accord the opinion.[1] *See* Social Security Ruling 96-2p (stating that a finding that a treating physician's opinion is not well supported or inconsistent with other substantial evidence in the record "means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527."). The factors include: (1) the length of the treatment relationship and

---

[1] Because Edmunds' claim was filed before March 27, 2017, the rules in 20 C.F.R. § 404.1527 apply. 20 C.F.R. 404.1520c.

the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability of the opinion; (4) consistency of the opinion with the record as a whole; (5) the specialization of the treating source; and (6) any other factors brought to the ALJ's attention that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2)(I)-(ii), (c)(3)-(6); *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017).

Opinions of treating and examining physicians may only be rejected under certain circumstances.  *Lester*, 81 F.3d at 830.  To discount an uncontradicted opinion of a treating or examining physician, the ALJ must provide "clear and convincing reasons."  *Id.*  To discount the controverted opinion of either, the ALJ must provide "'specific and legitimate reasons' supported by substantial evidence in the record."  *Id.*; *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012)*; Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  The ALJ can accomplish this by setting forth "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).  "The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct."  *Reddick*, 157 F.3d at 725.

/ / /

/ / /

### a.     Dr. Klee

As to Dr. Klee, the ALJ discounted his opinion because Dr. Klee is a family practice physician and not a mental health specialist.  (A.R. 445.)  The mere fact Dr. Klee is not a specialist, however, is not a specific and legitimate reason to assign minimal weight to his opinion.  "The Ninth Circuit has long recognized that a treating physician's opinion on the mental state of his patient constitutes 'competent psychiatric evidence' which 'may not be discredited on the ground that he is not a board certified psychiatrist.'"  *Norwood v. Saul*, 2020 WL 1528164, *3 (D. Nev. Mar. 31, 2020) (citing *Lester v. Chater*, 81 F.3d 821, 833 (9th Cir. 1995)).

Nevertheless, Dr. Klee's status as a general practitioner is something the ALJ can consider.  20 C.F.R. § 404.1527.  But in doing so, the ALJ must also consider the length, nature, and extent of the treatment relationship, *id.*, which, here, may favor giving more weight to his opinion.  In considering these other factors, the ALJ noted Dr. Klee had a "treatment relationship" with Edmunds, but treatments were "infrequent" and were limited to prescribing medications and advising Edmunds to reconsider his use of marijuana.  (A.R. 445.)  The ALJ's characterizations are not entirely supported by the record.

Dr. Klee's "treatment relationship" with Edmunds actually spanned well over a decade, with treatment notes dating back to December 2005, and at times was fairly frequent.  (A.R. 264-303; 313-48; 351-404; 1801-09.)  In 2013, for

example, Dr. Klee saw Edmunds at least five times.  (A.R. 313-22; 403.)  Dr. Klee

also saw Edmunds for a variety of issues, including depression and anxiety, chest

pain and palpitations, bowel and stomach issues, shoulder issues, skin issues, knee

pain, hand tremors, and bladder issues.  (*Id.*)  Further, his treatments were not as

limited as suggested by the ALJ.  Rather, treatments included prescribing and

managing multiple medications (*Id.*, generally), prescribing exercises (A.R. 370),

ordering x-rays (A.R. 367, 397), administering shoulder injections (A.R. 393), and

oftentimes spending 20-30 minutes discussing issues with Edmunds (A.R. 268,

313, 351, 358, 380, 388, 390, 403).

The ALJ also found Dr. Klee's opinion overstated the severity of Edmunds

impairments, because a person with such limitations would likely need specialized

psychiatric care.  (*Id.*)  Yet Dr. Klee's notes indicate that Edmunds did in fact need

specialized care.  (A.R. 266, 270-71, 403.)  But the record shows financial

obstacles were preventing Edmunds from accessing the specialized psychiatric care

he needed.  (A.R. 313, 398, 401, 403.)  The ALJ failed to consider Edmunds'

ability to afford specialized treatment, and as such, this was not a legitimate reason

to reject the opinion of Dr. Klee.  *Gamble v. Chater*, 68 F.3d 319, 322 (9th Cir.

1995); *Orn*, 495 F.3d at 638.

The ALJ further discounted the opinion because Dr. Klee didn't mention

Edmunds' marijuana use, was based on Edmund's subjective complaints, Dr. Klee

did not perform objective testing, and his opinion differed sharply from that offered by Dr. Sophia.  (A.R. 445.)  Again, these findings lack support in the record.  Dr. Klee provided a supplemental opinion stating that Edmunds' substance use was not a material contributing factor to his disability.  (A.R. 410.)  Thus, Dr. Klee did address Edmunds' marijuana use.  Further, Dr. Sophia did not offer a specific assessment of Edmunds' functional capacity.  She did note, however, that Edmunds' social functioning was impaired, which is at least somewhat consistent with Dr. Klee's opinion.  (A.R. 309-10.)

Moreover, Dr. Klee's reliance on Edmunds' self-reported symptoms and lack of objective testing is not a valid reason to reject his opinions concerning Edmunds' mental health.  In *Buck v. Berryhill*, the Ninth Circuit recognized that psychiatric evaluations and diagnoses "will always depend in part on the patient's self-report . . . such is the nature of psychiatry . . . 'unlike a broken arm, a mind cannot be x-rayed.'"  869 F.3d 1040, 1049 (9th Cir. 2017).  As a result, the Ninth Circuit held "the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness."  *Id.*

Accordingly, the ALJ did not properly consider or weigh Dr. Klee's opinion.

**b.   N.P. Cassel/Dr. Whitworth**

The ALJ also gave lesser weight to N.P. Cassel/Dr. Whitworth's assessment of the limiting effects of Edmunds' mental impairments.  (A.R. 446.)  The ALJ

found their opinions overstated the severity of Edmunds' mental impairments compared to objective clinical observations; that the checkbox form they filled out provided no rationale or explanation in support of their opinions; and they failed to address Edmunds' marijuana use. (*Id.*)

An ALJ may reject a treating physician's opinions on the basis of a conflict between the physician's opinions and his treatment notes. *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014). Here, the ALJ pointed to some examples where N.P. Cassel's treatment notes appear inconsistent with the opined limitations. The ALJ found, for example, that Edmunds' reported forgetfulness or distractedness was inconsistent with Cassel's note that Edmunds' memory was intact, and his reported poor concentration and social isolation was contradicted by her note that he was playing chess online in October 2017. (A.R. 446.) The ALJ also noted that N.P. Cassel/Dr. Whitworth's opinions of marked limitations in concentration and interacting with others were inconsistent with the examination notes from other providers, such as Dr. Lee, who purportedly found Edmunds was "pleasant, interactive, alert, [] in no acute distress, [and] had normal memory, attention span, language, and fund of knowledge." (A.R. 446-47) (citing A.R. 1690, 1693, 1706, 1709, 1713, 1716, 1721.) Again, the Court finds the ALJ's findings are not fully supported by the record.

First, the ALJ appears to cherry-pick from the record to support discounting N.P. Cassell/Dr. Whitworth, which is error.  *Attmore v. Colvin*, 827 F.3d 872, 877 (9th Cir. 2016) ("An ALJ cannot simply pick out a few isolated instances of improvement over a period of months or years but must interpret reports of improvement . . . with an understanding of the patient's overall well-being and the nature of her symptoms.'") (internal quotations, citations omitted); *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014).

The ALJ discounted N.P. Cassell/Dr. Whitworth' opinions by relying on selective citations to periodic improvements in Edmunds' mental state, while ignoring other negative observations.  As noted above, the ALJ found Edmunds' ability to play chess in October 2017 (A.R. 1735) was inconsistent with his reported poor concentration.  But N.P. Cassel's notes also indicate that at times Edmunds reported he was too distracted to read (A.R. 1479), his mind would drift when listening to talks on the computer and he wasn't watching television (A.R. 1501), he had difficulty sustaining attention when listening to religious sermons (A.R. 1510), and he couldn't read or watch movies because he forgot the plot (A.R. 1526).  Similarly, the ALJ points to times when Edmunds made decent eye contact, was polite and cooperative, and was not tearful as being inconsistent with the opined marked limitations.  (A.R. 446.)  While accurate, the treatment notes also cite numerous instances where Edmunds was "quite anxious and depressed" (A.R.

1457), "depressed and more anxious" (A.R. 1460), "more somber" (A.R. 1460),

had "scattered" thought processes and "difficulty staying on track" (A.R. 1466),

was "mildly inappropriate" (A.R. 1471), was "loud," "dramatic" and appeared to

be "hypomanic" (A.R. 1474), was "constricted with poor eye contact" (A.R. 1480),

was "anxious," "agitated," and "irritable and defensive" (A.R. 1487), was "tearful

and dramatic" (A.R. 1493), appeared "somewhat sullen" with "poor eye contact"

(A.R. 1499), made "minimal to no eye contact" (A.R. 1502), was "constricted"

with "almost no eye contact" (A.R. 1504), was "anxious, intermittently tearful"

(A.R. 1730), was "visibly upset, poor eye contact" (A.R. 1733), was having

difficulty remembering information he wanted to talk about (A.R. 1754), and was

"constricted" and "less interactive" (A.R. 1761).

Moreover, periodic improvements are fully consistent with Edmunds'

mental disorders, which are diseases that often present episodically. *Elder v.*

*Astrue*, 391 Fed.Appx. 599, 601 (9th Cir. 2010) (error for ALJ to reject treating

physician's opinion based on periodic improvement where the plaintiff was

diagnosed with bipolar disorder); *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th

Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and

depression makes some improvement does not mean that the person's impairments

no longer seriously affect her ability to function in a workplace.").  Thus, although

the conflicts identified by the ALJ could justify discounting a treating physician's

25

opinion in some cases, there is not substantial evidence in the record here to support the reason the ALJ gave for rejecting N.P. Cassel/Dr. Whitworth's opinions.

Second, the ALJ's characterization of Dr. Lee's notes is simply contrary to the record. It appears Dr. Lee saw Edmunds in the emergency department on one occasion in July 2017, for follow-up after gallbladder surgery. (A.R. 1705-06.) Dr. Lee's note indicated only that Edmunds was "awake and alert." (A.R. 1706.) Nowhere did he state that Edmunds was "pleasant," "interactive," or comment on his memory, attention span, language or fund of knowledge. As such, the ALJ's reliance on Dr. Lee's treatment note was not a legitimate basis to discount N.P. Cassel/Dr. Whitworth's opinions.

As to the ALJ's rejection of the opinions because they were checked-box type forms, it is improper to reject a physician's opinion merely for being expressed on a check-off report. *Popa v. Berryhill*, 872 F.3d 901, 907 (9th Cir. 2017). The Ninth Circuit recently recognized that a check-the-box opinion could be rejected where it lacked a required explanation, and the opinion was contradicted by the record. *Ford v. Saul*, 950 F.3d 1141, 1155 (9th Cir. 2020). But *Ford* is distinguishable from this case. There, the questionnaire completed by the physician specifically asked for an explanation of why the claimant met certain Listings, which the physician did not provide. *Id.* at 1151. Further, the physician's

summary conclusion that the claimant met the Listings was contradicted by the medical record.  *Id.* at 1155.   Here, in contrast, the forms completed by N.P. Cassel/Dr. Whitworth did not request any specific explanation (A.R. 1056-58), and as discussed above, were not clearly contradicted by the record when viewed in its entirety.

Finally, the ALJ correctly pointed out that N.P. Cassel/Dr. Whitworth did not address Edmunds' marijuana use.  (A.R. 1056-58.)  Nevertheless, Edmunds had started to taper off marijuana around the time their evaluations were issued. (A.R. 1477, 1480, 1487.)  Therefore, it may not have been a relevant factor in their opinion of Edmunds' limitations.

Accordingly, the Court finds the ALJ did not properly consider or weigh N.P. Cassel/Dr. Whitworth's opinions.

### C.    Step Three Listings

Edmunds argues the ALJ erred in not finding his impairments meet the Listings in sections 12.04, 12.06, or 12.08 of appendix 1.  (Doc. 23 at 28.)  The Commissioner argues that Edmunds failed to show he met the high level of severity required for the Listings.  (Doc. 24 at 17.)

To meet a Listing under 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), or 12.08 (personality and impulse-control disorders), a claimant must satisfy the requirements of paragraphs

27

A (medical criteria) and B (functional criteria) or paragraphs A and C (serious and persistent criteria).  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00.  To satisfy paragraph B criteria, the claimant's mental disorder must result in an "extreme" limitation of one area, or "marked" limitation of two of the following four areas, of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself.  *Id.* at ¶ 12.00(A)(2)(b).  To satisfy the paragraph C criteria, a claimant's mental disorder must be "serious and persistent"; that is, a medically documented history of the existence of the disorder over a period of at least 2 years, and the evidence must satisfy the criteria in both C1 and C2 (see 12.00G).  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(A)(2)(c).  The ALJ found that Edmunds had only moderate limitations in each of the four areas and thus did not meet the paragraph B criteria.  (A.R. 439.)  The ALJ also found that Edmunds failed to meet the criteria in paragraph C.  (A.R. at 440.)

Because reconsideration of Dr. Klee and N.P. Cassel/Dr. Whitworth's opinions may impact the ALJ's step three analysis, the Court finds the ALJ's determination at step three is not supported by substantial evidence.

### D.    Edmunds' Subjective Symptom Testimony

Edmunds argues that the ALJ improperly discounted his subjective symptom testimony relating to the intensity, persistence, and functional limiting effects of

his impairments.  (Doc. 23 at 25.)  The Commissioner argues that the ALJ reasonably evaluated Edmunds' subjective complaints.  (Doc. 24 at 6.)

A claimant's testimony is analyzed in two steps.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged.  *Id.* Second, if there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if she provides "specific, clear and convincing reasons" for doing so.  *Id.*  "In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'"  *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010).  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Reddick v. Chater*, 157 F.3d at 722 (quoting *Lester*, 81 F.3d at 834).  *See also Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015). The clear and convincing standard "is not an easy requirement to meet: '[It] is the most demanding required in Social Security cases.'"  *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014).

To assess a claimant's subjective symptom testimony, the ALJ may consider (1) ordinary credibility techniques, (2) unexplained or inadequately explained failure to seek or follow treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989). An ALJ may also take the lack of objective medical evidence into consideration. *Baston v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

Here, the ALJ determined that Edmunds' medically determinable impairments could reasonably be expected to cause his symptoms, and there is no argument that he is malingering. Therefore, the ALJ was required to cite specific, clear, and convincing reasons for rejecting Edmunds' subjective testimony about the severity of his symptoms. The Court finds the ALJ failed to do so.

Edmunds alleged he was unable to work due to poor memory, quick temper, personal interaction, social isolation, forgetfulness, sleeplessness, distractibility, paranoia, poor concentration, and incompletion of tasks. (A.R. 441.) The ALJ discounted Edmunds' testimony as inconsistent with the objective medical evidence. (A.R. 441-44.) In doing so, the ALJ pointed to select medical evidence, concluding it failed to fully support Edmunds' allegations of impairment. (*Id.*) Overall, the ALJ's credibility finding suffers from the same defect noted above with regard to the treating providers, in that the ALJ selectively relied on periods

of improvement. It is error for the ALJ "to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." *Garrison v. Colvin*, 759 F.3 995, 1017 (9th Cir. 2014). Rather, the ALJ is required to examine the overall diagnostic record. *Id.*; *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014).

For example, the ALJ found Edmunds' symptoms improved by February 2016, after he limited his marijuana use. (A.R. 445.) But the record reveals continued problems even after Edmunds ceased using marijuana. In March 2016, Edmunds was noted as "tearful and dramatic," reported "severe insomnia" and sleeping medication was prescribed (A.R. 1493-94); in April 2016, he reported "severe anxiety" and continued sleep disturbance (A.R. 1496); the following month, he appeared "somewhat sullen" and made "poor eye contact" (A.R. 1499); in July 2016, he had "no significant improvement in his level of depression," his "anger level is higher," and although a urine drug screen showed an almost indetectable level of THC, his affect "remains constricted, [with] almost no eye contact" and his judgment and insight was "fair to poor" (A.R. 1503-04); and in September 2016, he was not as depressed but his anxiety was worse, his hair appeared "greasier and disheveled" and his judgement and insight remained "fair to poor" (A.R. 1508-09). In January 2017, after being off of marijuana for about a year, Edmunds appeared to be doing better. (A.R. 1514-16.) But by March 2017,

he reported being depressed, isolating, quitting an online bible group, and increased irritability including "thr[owing] a knife at the wall after an argument" (A.R. 1518-19); in June 2017, he was "anxious" and "intermittently tearful", and reported contemplating suicide because his counselor changed jobs (A.R. 1526); in August 2017, he was "constricted, visibly upset" and made "poor eye contact" and was having "more fleeting suicidal thoughts" (A.R. 1732); and in October 2017, he reported isolating and had a "constricted" affect and "poor self esteem with very negative outlook." (A.R. 1735).

 The ALJ pointed to observations of good grooming and hygiene, alertness, orientation, and improving patience; effectiveness of prescriptions; adequate mood, sleep, and tolerance of others; well-articulated speech, self-expression, and adequate attention and concentration; game playing and the ability to drive.  (A.R. 441-42.)  As summarized in part above, however, these positive observations in the record are interspersed with numerous negative observations.

The ALJ also stated that it appeared Edmunds was "primarily interested in smoking marijuana, as he had not sought assistance at the Mental Health Center or RiverStone Health."  (A.R. 443.)  Although the failure to seek treatment may be considered in assessing a claimant's subjective symptom testimony, the inability to afford medical treatment cannot be used as a basis for denying disability benefits or finding a claimant's testimony not credible.  *Orn*, 495 F.3d at 638; *Gamble*, 68

F.3d at 322.  Here, the ALJ did not consider whether Edmunds' delay in obtaining

specialized mental health care was due to lack of resources.  This was error

because the record demonstrates that Edmunds did not have insurance (A.R. 398)

and was having difficulty affording mental health care (A.R. 313), medications

(A.R. 403, 1493), and even food (A.R. 1465).

As such, the Court finds that the ALJ's evaluation of Plaintiff's subjective

symptom testimony is not supported by specific, clear, and convincing reasons.

### E.  Vocational Expert's Hypothetical

Hypothetical questions posed to the vocational expert must set out all the

limitations and restrictions of the particular claimant.  *Embrey v. Bowen*, 849 F.2d

418, 422 (9th Cir. 1988).  "The testimony of a vocational expert 'is valuable only

to the extent that it is supported by medical evidence.'" *Magallanes*, 881 F.2d 747,

756 (9th Cir. 189) (quoting *Sample*, 694 F.2d 639, 644 (9th Cir. 1982)).  If the

assumptions in the hypothetical are not supported by the record, then the

vocational expert's opinion that the claimant has a residual working capacity has

no evidentiary value.  *Embrey*, 849 F.2d at 422.

Edmunds argues that the hypothetical the ALJ relied on to find he could

perform work was deficient because it did not incorporate all of his limitations,

including his need for time off work for treatment.  As discussed above, the Court

has determined the ALJ failed to properly consider the frequency and duration of

his treatment, the treating physicians' opinions, and failed to adequately support the credibility finding.  Accordingly, these errors may have infected the hypothetical the ALJ relied on, and in turn, the ALJ's determination that Plaintiff could perform work.

The Court, therefore, finds the ALJ's determination at step five is not supported by substantial evidence.

## V.      Remand or Reversal

Edmunds asks the Court to remand this case for proper consideration of all of his impairments, his credibility, the medical evidence, and vocational evidence, or alternatively for a remand for an award of benefits.  (Doc. 23 at 34.)  "[T]he decision whether to remand a case for additional evidence or simply to award benefits is within the discretion of the court."  *Reddick v. Chater*, 157 F.3d at 728. If the ALJ's decision "is not supported by the record, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'"  *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)).  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded.  Where, however, a rehearing would simply delay receipt of benefits, reversal [and an award of benefits] is appropriate."  *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).

The Court finds remand for further proceedings is appropriate.  On remand, the ALJ shall properly consider Edmunds' treatment needs, evaluate the opinions of Dr. Klee and N.P. Cassel/Dr. Whitworth, reconsider whether Edmunds meets a Listing at step three, reconsider his subjective symptom testimony, and reconsider whether Edmunds can perform work in the national economy based upon a hypothetical that incorporates all of his impairments and limitations supported by the record.

## VI.    Conclusion

Based on the foregoing, **IT IS ORDERED** that the Commissioner's decision be **REVERSED** and this matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

DATED this 29th day of September, 2021.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge

35